UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| MITCHELL DVOSKIN,<br><br>    *Plaintiff*,<br><br>v.<br><br>BIO-REFERENCE LABORATORIES, INC., et al.,<br><br>    *Defendants*. | Civil Action No. 18-10667<br><br>OPINION |

**ARLEO, UNITED STATES DISTRICT JUDGE**

**THIS MATTER** comes before the Court on Defendants Bio-Reference Laboratories, Inc.'s ("BRLI") and OPKO Health, Inc.'s ("OPKO" and together with BRLI, "Defendants") Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56. ECF No. 38. Plaintiff Mitchell Dvoskin ("Plaintiff") opposes the Motion. ECF No. 39. For the reasons explained below, the Motion is **GRANTED IN PART** and **DENIED IN PART**.

**I.    FACTUAL BACKGROUND**[1]

This matter arises from Defendants' termination of Plaintiff, a software developer. See generally Compl., ECF No. 1. Plaintiff alleges age discrimination, disability discrimination, and retaliation under New Jersey and federal law.

---

[1] These facts are drawn from Defendants' Statement of Undisputed Material Facts ("DSUF"), ECF No. 38.4, Plaintiff's Statement of Additional Facts ("PSAF"), ECF No. 39.3, and the relevant record. Disputes of fact are noted.

Plaintiff was born on July 22, 1954 and was 63 years of age at the time of his termination. PSAF ¶ 1. He has a history of coronary issues, including corroded arteries, a 2012 stent procedure, and a 2017 triple bypass surgery. Id. ¶¶ 8, 33.

BRLI hired Plaintiff on June 14, 2010 to work in its IT department and perform tasks related to a proprietary billing software called "Vertex." DSUF ¶ 1. Plaintiff primarily reported to Wolfgang Pillon ("Pillon"), a third-party contractor of Plaintiff who owned the Vertex software. Pl. Dep Tr. 20:12-14, 51:2-12, Pl. Ex. T, ECF No. 39.7. According to Plaintiff, he was hired after BRLI became concerned that if Pillon were to retire or die, there would be no one able to keep the Vertex software operational. Id. at 51:14-53:2. Plaintiff further testified that he was hired specifically to work on Vertex and that Vertex accounted for 90 to 95% of his work during his employment, although he occasionally worked on other assignments. DSUF ¶ 3; Pl. Dep. Tr. 27:6-28:25.

Beginning in 2010 or 2011, BRLI began discussions to phase out Vertex in favor of a new automated billing system called "XIFIN." PSAF ¶ 13.[2] By as early as 2015, BRLI developed a two-pronged phase out of Vertex, which Defendants[3] ultimately implemented. In accordance with the planned phase out, XIFIN would first launch on October 1, 2016, and thereafter no new billing information would be processed through Vertex. DSUF ¶ 4; PSAF ¶13. Second, Vertex would shut down on October 1, 2017, except for certain maintenance and archival-related tasks. DSUF ¶ 4; PSAF ¶13. BRLI Vice President of Finance Kevin Feeley ("Feeley") testified that "as early

---

[2] Plaintiff was told at the time of his hire that Vertex would eventually be phased out. DSUF ¶ 3; Pl. Dep Tr. 50:4-9, 52:3-6.

[3] OPKO acquired BRLI in or about June 2015. DSUF ¶ 15. Pursuant to the merger agreement, OPKO assumed control of all BRLI operations as of December 31, 2016. PSAF ¶ 6.

2

as February 2017," he issued a "directive that any and all individuals associated with [Vertex] . . . would have their positions at the company eliminated."[4]  DSUF ¶ 11.

On March 7 or 8, 2017, Plaintiff informed Pillon that he would be absent on March 9 and March 10 to undergo a coronary procedure.[5]  Following the procedure, Plaintiff learned that he would require triple bypass surgery.  PSAF ¶ 31.  On March 10, 2017, Plaintiff informed Pillon and Chief Information Officer John Mooney ("Mooney") of his need for surgery and medical leave.  Id. ¶ 32.  Plaintiff thereafter initiated a leave of absence pursuant to the Family Medical Leave Act, 29 U.S.C. §§ 2601, et seq. ("FMLA") from March 17 to May 1, 2017.  Id. ¶¶ 33, 37; DSUF ¶ 28.

Upon Plaintiff's return to work, Mooney informed Plaintiff that he would be transferred out of the IT department into the billing department, that he would now report to Steve Washburn ("Washburn"), and that Plaintiff did not have the option to remain within IT.  PSAF ¶¶ 37-38.[6]  Plaintiff testified that before his leave, he performed custom software development, always had at least forty hours of work each week, and had the title of "Systems Developer."  Id. ¶ 39.  After his transfer to the billing department, Plaintiff was reclassified as a "Data Analyst."  Id.  In his new role, Plaintiff had a reduced workload and performed "less-complex, lower-level work, including substantial amounts of clerical work, which he'd not been performing previously."  Id.  However, Plaintiff testified that despite the change in departments, he continued to work primarily on the Vertex system.  Pl. Dep. Tr. 103:1-7.[7]

---

[4] No evidence suggests that Plaintiff knew of Feeley's directive.

[5] Plaintiff testified that this conversation took place "a day or two" before his procedure.  Pl. Dep. Tr. 204:17-25.

[6] Feeley, Mooney, and Washburn were each involved in the decision to transfer Plaintiff.  See Feeley Dep. Tr. 88:5-23, 113:4-16, Pl. Ex. U, ECF No. 39.8.

[7] Defendants maintain that Plaintiff performed the same job before and after his medical leave, though they concede that Plaintiff served a different function following the transfer.  See DSUF ¶ 32.  According to Defendants, any change or reduction in Plaintiff's duties was the natural result of the Vertex phase out.

In June and July 2017, Plaintiff made several formal and informal complaints to Defendants regarding his transfer. On June 27, Plaintiff called a Human Resources ("HR") representative and expressed his view that the transfer was a violation of the FMLA and a precursor to a termination based on his disability. PSAF ¶ 53. Plaintiff submitted a written complaint reiterating his concerns on June 29. Id. ¶ 54. On July 5, he met with Monika Lee ("Lee"), an HR representative, to discuss his complaints of age, disability, and FMLA discrimination. Id. ¶ 57. Plaintiff also complained to Washburn and Pillon about his perceived discrimination. Id. ¶ 60. On July 31, 2017, Plaintiff submitted a second written complaint to Lee, repeating his complaints of age, disability, and FMLA discrimination. Id. ¶ 70. Lee circulated this complaint to Washburn, who forwarded it to Feeley and Mooney. PSAF ¶ 77; Pl. Ex. D, ECF No. 39.4. On August 2, Feeley responded directly to Lee, asking for a meeting so they could "map out the path forward to termination together." PSAF ¶ 84; Pl. Ex. D. The same day, Lee responded to Plaintiff informing him that Defendants disagreed with his FMLA and discrimination claims. PSAF ¶ 103; Pl. Ex. Q, ECF No. 39.6.

During this same period, in or around July 2017, Plaintiff formally applied for four open billing and IT positions with BRLI: "Business Analyst," "QA Analyst," "Data Analyst," and "HL 7 Integration Developer." Compl. ¶ 58; Pl. Dep Tr. 145:2-17, 150:9-151:2.[8] Defendants required current employees seeking a new position to apply through its Talent Acquisition department ("TA"). Pl. Dep Tr. 22:20-24:2; see also Declaration of Jeanne Calton ("Calton Decl.") ¶ 2, ECF No. 38.2.[9] TA operates separately from the HR department and performs an "independent inquiry"

---

[8] In opposition to Defendants' Motion, Plaintiff contends that he applied for nine open positions. PSAF ¶ 62. As the allegations of five additional positions were not pled in the Complaint, the Court considers only the four positions noted above in assessing Plaintiff's failure to hire claims.

[9] Plaintiff argues that the Court should exclude the Calton Declaration from consideration because it was not disclosed until after the close of discovery. But Plaintiff has not argued that Defendants failed to disclose Calton as a witness with relevant information or that the statements in her declaration were responsive to deposition questions but not

to find the best candidate for each position, with input from the hiring manager who posted the listing.  See Calton Decl. ¶¶ 3-4; Washburn Dep. Tr. 165:4-168:8, Pl. Ex. V, ECF No. 39.9.  TA does not have access to HR files, and when a current employee applies for an open position, HR does not provide TA with the applicant's age, medical conditions, past leaves of absences, or history of complaints.  Calton Decl. ¶¶ 3, 5.  Plaintiff applied for each of the above four positions through TA but was not selected or interviewed for any position.  PSAF ¶ 68; Pl. Dep. Tr. 150:17-20.

Defendants terminated Plaintiff on August 10, 2017.  PSAF ¶¶ 4, 105.[10]  As of the date of the Motion, Plaintiff remains unemployed.  PSAF ¶ 12.

## II. PROCEDURAL HISTORY

Plaintiff filed the four count Complaint on June 15, 2018 asserting (1) disability discrimination and retaliation, in violation of the American Disabilities Act, 42 U.S.C. §§ 12101, et seq. ("ADA"), Compl. ¶¶ 82-87 ("Count I"); (2) age discrimination and retaliation, in violation of the Age Discrimination in Employment Act, 29 U.S.C. §§ 621, et seq. ("ADEA"), id. ¶¶ 88-93 ("Count II"); (3) family leave interference and retaliation, in violation of the FMLA, id. ¶¶ 94-101 ("Count III"); and (4) discrimination and retaliation, in violation of the New Jersey Law Against Discrimination, N.J.S.A. § 10:5-12 ("NJLAD"), id. ¶¶ 102-07 ("Count IV").  Defendants filed an Answer on August 28, 2018.  ECF No. 9.  Following discovery, Defendants now move for summary judgment on each count of the Complaint.  ECF No. 38.

---

provided.  See Fed. R. Civ. P. 26(a)(1)(A)(i); cf. Webster v. Dollar Gen., Inc., 314 F.R.D. 367, 370-72 (D.N.J. 2016) (excluding summary judgment declarations because witnesses were not previously disclosed).  The Court therefore finds no basis to exclude the Calton Declaration.

[10] Feeley, Washburn, Mooney, and Lee were each involved in the decision to terminate Plaintiff.  Feeley Dep Tr., 74:18-75:1, 118:13-21; Mooney Dep Tr. 107:21-108:5, Pl. Ex. W, ECF No. 39.10.

### III. LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 56(c), the Court will grant a motion for summary judgment if the pleadings, depositions, answers to interrogatories, and admissions on file, together with available affidavits, show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "[S]ummary judgment may be granted only if there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party." Miller v. Ind. Hosp., 843 F.2d 139, 143 (3d Cir. 1988).

The Court construes all facts and inferences in the light most favorable to the non-moving party. Peters v. Del. River Port Auth., 16 F.3d 1346, 1349 (3d Cir. 1994). "[A] party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 248 (citing First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968)) (internal quotation marks omitted).

### IV. ANALYSIS

Each of Plaintiff's claims are governed by the three-step burden shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Sulima v. Tobyhanna Army Depot, 602 F.3d 177, 185 (3d Cir. 2010) (ADA discrimination); Hohider v. United Parcel Serv., Inc., 574 F.3d 169, 192 (3d Cir. 2009) (ADEA discrimination); Victor v. State, 203 N.J. 383, 408 (2010) (NJLAD discrimination); Stouch v. Twp. of Irvington, 354 F. App'x 660, 667 (3d Cir. 2009) (ADA retaliation); Daniels v. Sch. Dist. of Philadelphia, 776 F.3d 181, 193 (3d Cir. 2015) (ADEA retaliation); Craig v. Suburban Cablevision, Inc., 140 N.J. 623, 629-30 (1995)

(NJLAD retaliation); Lichtenstein v. Univ. of Pittsburgh Med. Ctr., 691 F.3d 294, 301-02 (3d Cir. 2012) (FMLA retaliation).

Under this framework, Plaintiff first bears the burden to establish a prima facie case of discrimination or retaliation. For his disparate treatment claims, Plaintiff must demonstrate that (1) he is a member of a protected class, i.e., that he is disabled and over the age of forty; (2) he was otherwise qualified for the position at issue; (3) he suffered an adverse employment decision; and (4) "the adverse action occurred under circumstances that create an inference that plaintiff's age [or disability] was a motivating factor." See Dodson v. Coatesville Hosp. Corp., 773 F. App'x 78, 80 & n.3 (3d Cir. 2019). For his retaliation claims, Plaintiff must show "(1) that [he] engaged in protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." Daniels, 776 F.3d at 193.

Second, if Plaintiff establishes a prima facie case, the burden shifts to Defendants to articulate a legitimate business reason for the adverse employment action. Dodson, 773 F. App'x at 80; Daniels, 776 F.3d at 193. Third, Plaintiff bears the final burden to demonstrate that Defendants' proffered reasoning was a mere pretext through evidence that the provided rationale was false or that the real reason for the adverse action was discriminatory or retaliatory animus. Dodson, 773 F. App'x at 80; Daniels, 776 F.3d at 193.

Plaintiff alleges that he suffered three adverse actions: his transfer to the billing department, his termination, and Defendants' failure to hire him into an open position. The court examines each.

### A. Plaintiff's Transfer and Termination

Plaintiff argues that his transfer and termination were the result of (1) class-based discrimination, on the basis of his age and disability; (2) retaliation for his invocation of FMLA leave; and (3) retaliation for the complaints he submitted to management. The Court concludes that a question of material fact exists only as to whether Defendants terminated Plaintiff in retaliation for his FMLA leave and complaints.

#### 1. Age and Disability Discrimination

Defendants first argue that Plaintiff has not presented evidence creating an inference of intentional, class-based discrimination to satisfy the fourth element of a prima facie case of disparate treatment under the ADA, ADEA, or NJLAD.[11] The Court agrees.

An employee challenging a termination or transfer can satisfy the fourth element of a prima facie case by showing (a) "he was replaced by a person sufficiently [outside the protected class] to permit an inference of . . . discrimination," (b) "during a reduction in force, [employees outside the class] were retained when plaintiff was fired," or (c) "other facts sufficient to create an inference that an employment decision was based on age [or disability]." Dodson, 773 F. App'x at 80 n.3 (citation and quotations omitted).

Here, Plaintiff was not replaced following his termination, DSUF ¶ 50, and nothing indicates that Defendants filled Plaintiff's position in the IT department following his transfer. Moreover, while the record suggests that Plaintiff's termination occurred alongside a broader reduction of workforce,[12] Plaintiff presents no evidence to suggest that this reduction

---

[11] Defendants also argue that Plaintiff's transfer was not a materially adverse employment action. The Court need not address this argument in light of its disposition, and Defendants do not dispute the remaining elements of Plaintiffs' disparate treatment claims.

[12] Defendants proffer testimony that in connection with the transition from Vertex to XIFIN, BRLI's billing department was reduced from 325 full-time employees in February 2017 to 200 employees by the end of the 2018. Feeley Dep. Tr. 42:21-43:14.

8

disproportionately targeted older or disabled individuals. He must therefore rely on "other facts" creating an inference of discrimination, but no such facts exist in the record. Each of Plaintiff's arguments to the contrary are unavailing.

Plaintiff first argues that the timing of discussions concerning his transfer suggests discriminatory intent. He asserts that Defendants began discussing his transfer to the billing department on March 7, 2017, or the same day Plaintiff informed Pillon, his direct supervisor, that he would miss two days to undergo a coronary procedure. In support, Plaintiff offers an email showing that on March 7, Washburn suggested transferring Plaintiff to fill an opening created when a programmer, Amal Abadeer ("Abadeer"), accepted another position at BLRI. Pl. Ex. C, ECF No. 39.4 at D-000320. But Plaintiff has provided no evidence that Washburn, as opposed to Pillon, even knew of Plaintiff's impending procedure as of March 7.[13] There is accordingly no causal link between Plaintiff's discussion with Pillon and Washburn's recommendation to transfer Plaintiff. Absent this link, the timing of his transfer cannot establish the inference of discrimination.

Second, Plaintiff asserts that he was one of the oldest employees in the IT department at the time of his transfer, PSAF ¶ 40, the oldest employee reporting to Washburn in the Billing Department at the time of his termination, id. ¶ 50, and the only employee who Washburn was aware of suffering from a disability, id. But even accepting these contentions as true, an inference of discrimination cannot be established through a decisionmaker's "[m]ere knowledge that Plaintiff is a member of a protected class," Rene v. Lidestri Foods, Inc., No. 09-3908, 2010 WL 4807050, at *8 n.4 (D.N.J. Nov. 17, 2010), or the fact that Plaintiff was the only member of a

---

[13] Indeed, Washburn indicates in a later email in the chain that he had not yet discussed the potential transfer with Pillon or Mooney as of the morning of March 8, 2017. Pl. Ex. C at D-000319. Plaintiff testified that he first recalled discussing his medical conditions with Washburn in May 2017. Pl. Dep. Tr. 132:19-133:6.

9

protected class in his department, Sessoms v. Trustees of Univ. of PA., No. 16-2954, 2017 WL 2271817, at *5 (E.D. Pa. May 24, 2017), aff'd, 739 F. App'x 84 (3d Cir. 2018) (holding that employer's termination of the only disabled person and only African American employee in a department was "not sufficient to raise an inference of discrimination"). Further, as noted above, Plaintiff's termination did not occur in isolation but was part of an overall reduction in workforce.

Third, Plaintiff argues that despite his requests, Defendants refused to provide him with training on XIFIN, while "the majority of people in billing related positions," were trained in 2016 and 2017. PSAF ¶ 20. Plaintiff, however, "does not submit any evidence to suggest [Defendants] denied that training . . . for discriminatory reasons." Ortiz v. Cedar Crest Coll., 764 F. App'x 257, 259-60 (3d Cir. 2019). For instance, Plaintiff has not demonstrated that those who received XIFIN training were outside the protected class or that other members within the protected classes were denied such training.

Finally, Plaintiff maintains that Defendants failed to offer him a new position while similarly situated comparators were "routinely given new projects" or "transferred to another open position by Defendant." Pl. Opp. 28. As comparators, Plaintiff first identifies "every other individual who held a programmer or developer role in the IT department (or the Billing Department)." Id. at 27-28. But Plaintiff provides no information about the age and disability status of these unnamed comparators or, importantly, whether they performed roles comparable to Plaintiff's. See Hoist v. New Jersey, No. 12-5370, 2015 WL 4773275, at *14 (D.N.J. Aug. 13, 2015), aff'd, 642 F. App'x 169 (3d Cir. 2016) (to be "similarly situated," a comparator must be "similar in all relevant respects," including "the requirements, duties and responsibilities of the respective jobs"). Plaintiff further claims that Defendants did not terminate Abadeer, who performed work related to Vertex and is twelve years younger than Plaintiff, but instead transferred

10

her into a new position at BRLI. The record, however, shows that Abadeer received her new position only after applying for and receiving it through the TA department.[14] See Calton Decl. ¶ 14; see also Pl. Ex. C, at D-000320 (reflecting TA's involvement in Abadeer's transfer). Abadeer therefore cannot serve as a comparator in this regard.

Plaintiff has therefore failed to create an inference that discriminatory animus was a motivating factor in his transfer or termination and cannot establish a prima facie case of disability or age discrimination.[15]

### 2. Retaliation for FMLA Leave

Defendants next maintain that Plaintiff has failed to provide evidence of a causal connection between his FMLA leave and his transfer and ultimate termination or that Defendants' rationale for terminating Plaintiff was pretextual. The Court agrees as to the transfer but finds a dispute of material fact as to the termination.

To establish a prima facie case of FMLA retaliation, Plaintiff must show (1) invocation of a leave protected by the FMLA;[16] (2) an adverse employment action; and (3) a causal connection between his leave and the adverse action. Lichtenstein, 691 F.3d at 301-02. Causation can be established through (a) an "unduly suggestive" temporal proximity, (b) "a pattern of antagonism coupled with timing," or (c) other evidence sufficient to raise an inference of causation. Budhun v. Reading Hosp. & Med. Ctr., 765 F.3d 245, 258 (3d Cir. 2014); Lichtenstein, 691 F.3d at 307.

---

[14] When asked why Plaintiff could not have been transferred into an open position, Lee testified that "it doesn't work like that" and that "he would have to apply for those positions." Lee Dep. Tr. 158:4-21, Pl. Ex. X, ECF No. 39.11.

[15] As discussed below, the record contains a dispute of material fact as to whether Plaintiff's FMLA leave factored into Defendants' decision to terminate Plaintiff's employment. Such evidence, however, does not necessarily create an inference of class-based disability discrimination. See Walton v. Mental Health Ass'n. of Se. Pa., 168 F.3d 661, 669 (3d Cir. 1999) ("[W]e must not infer a particular type of discrimination from circumstances that merely indicate a wrongful firing of some sort."); see also id. at 668, 670 (holding that while defendant terminated an employee while on disability leave due in part to "extensive absences," "it would be wrong to infer from this that [the] decision to dismiss her was based on her disability").

[16] Defendants do not dispute that Plaintiff's medical leave was protected by the FMLA.

Critically, Plaintiff need only show that Defendants considered his leave "as a negative factor" in an adverse action. Lichtenstein, 691 F.3d at 301 ("Accordingly, an employee does not need to prove that invoking FMLA rights was the sole or most important factor upon which the employer acted.").[17]

As discussed above, Defendants began discussing Plaintiff's transfer on March 7, 2017, or three days prior to Plaintiff's request for medical leave on March 10. Pl. Ex. C, at D-000320; PSAF ¶ 32. Further emails indicate that by March 9, the relevant decisionmakers in this action—Washburn, Feeley, and Mooney—had all agreed to transfer Plaintiff to billing as of March 13, 2017. Pl. Ex. C, at D-000317 to D-000319. Thus, while Defendants ultimately took no action to effect the transfer during Plaintiff's medical leave, the record demonstrates that Plaintiff would have been transferred earlier had he not taken a leave of absence. Plaintiff therefore cannot establish a causal connection between his leave and his transfer.

There is, however, a sufficient causal connection between Plaintiff's leave and his termination, which occurred two months after his return. While a two-month gap between leave and termination may not be "unduly suggestive" standing alone, the record contains other evidence sufficient to infer causation. For example, upon learning that Plaintiff would miss several months of work, Washburn indicated in a March 14, 2017 email to Mooney and Feeley that he "did not know [the] extent of [Plaintiff's] absence" and recommended that they "review if Mitch is needed when he returns from LOA." Pl. Ex. CC, ECF No. 39.12. Drawing all inferences in Plaintiff's

---

[17] A plaintiff asserting FMLA retaliation may pursue either a "pretext" theory, or a "mixed-motive" theory. Egan v. Del. River Port Auth., 851 F.3d 263, 269 n.1 (3d Cir. 2017). Under a pretext theory, a plaintiff asserts that "an employer's stated justification for an employment decision is false" and requires proof that "the exercise of a protected right was a determinative factor . . . such that in the absence of the . . . protected conduct, the adverse employment action would not have occurred." Id. Under a mixed motive theory, a plaintiff claims "that an employment decision was based on both legitimate and illegitimate reasons," and requires proof "that exercise of FMLA rights was 'a negative factor' in the employer's employment decision." Id. "Whether a case is a pretext case or mixed-motives case is a question for the trial court at the conclusion of all the evidence." Lewis v. Univ. of Pa., 779 F. App'x 920, 926 (3d Cir. 2019) (citing Starceski v. Westinghouse Elec. Corp., 54 F.3d 1089, 1098 (3d Cir. 1995)).

favor, a reasonable factfinder could conclude from this email that Washburn—who ultimately participated in the decision to terminate Plaintiff—viewed Plaintiff's leave as a negative factor.

As Defendants have proffered a legitimate business reason for termination—a lack of work associated with the phase out of Vertex—Plaintiff must also point to evidence from which a factfinder could reasonably "disbelieve [Defendant's] articulated legitimate reasons," Lichtenstein, 691 F.3d at 302, or conclude that the "use of FMLA leave was a negative factor in the employment decision," Egan, 851 F.3d at 275. Again, Plaintiff has carried his burden to show evidence that his FMLA leave factored into his termination through Washburn's March 14, 2017 email. Cf. Marra v. Phila. Hous. Auth., 497 F.3d 286, 301 n.13 (3d Cir. 2007) (recognizing the "close similarity" and overlapping evidence involved in the first and third steps of the McDonnell Douglas analysis).

Moreover, the record contains evidence from which a jury could disbelieve Defendants' rationale for termination. Feeley and Washburn each gave testimony from which a jury could conclude that BRLI had initially planned to terminate Plaintiff and other Vertex-related positions either on or shortly after the scheduled shut down date of October 1, 2017. See Washburn Dep. Tr. 254:16-256:11; Feeley Dep. Tr. 58:21-59:19; see also DSUF ¶ 14 ("In a June 8, 2017 email, BRLI managers further discussed eliminating the Vertex related positions of Plaintiff and Mr. Pillon by September 30, 2017."). However, Plaintiff was ultimately terminated two months before Vertex was shut down, PSAF ¶ 4, and—as discussed in more detail below—only days after Plaintiff lodged a formal complaint to HR regarding a perceived FMLA violation.[18]

---

[18] The record also contains evidence that Pillon's position was not eliminated on September 30, 2017, but rather that Pillon remained affiliated with BRLI until his death in February 2018—five months after Vertex was shut down. Feeley Dep. Tr. 60:10-24; Pl. Dep. Tr. 79:5-11.

13

While far from conclusively establishing motive, the Court is satisfied that the above evidence creates a dispute of material fact as to whether Defendants retaliated against Plaintiff's exercise of FMLA rights. Plaintiff's FMLA retaliation claim may proceed with regard to his termination.[19]

### 3. Retaliation for Complaints to Management

Defendants further contend that Plaintiff cannot establish a prima facie case that he was terminated in retaliation for his complaints of discrimination to management,[20] or alternatively, cannot show that Defendants' articulated reason for termination was mere pretext. The Court disagrees.

The ADA, ADEA, NJLAD, and FMLA each provide a cause of action against an employer who retaliates against an employee's good faith complaint about discrimination or an FMLA violation. See Stouch, 354 F. App'x at 667 (ADA); Daniels, 776 F.3d at 192 (ADEA); Craig, 140 N.J. at 629-30 (NJLAD); Karaffa v. Twp. of Montgomery, 560 F. App'x 133, 136 (3d Cir. 2014) (FMLA). To establish a prima facie case of retaliation based on his complaints to management, Plaintiff must show (1) his complaints were a protected activity; (2) he was terminated; and (3) a causal connection between his complaints and termination. See Daniels, 776 F.3d 193.

---

[19] Plaintiff also purports to bring an independent FMLA "interference" claim arising out of his transfer to the billing department. Pl. Opp. at 17 n.15. To prevail on an interference claim, Plaintiff must show (1) he was entitled to take FMLA leave, and (2) Defendants interfered with his right to do so. Lichtenstein, 691 F.3d at 312; see also Erdman v. Nationwide Ins. Co., 582 F.3d 500, 509 (3d Cir. 2009) ("[F]iring an employee for a valid request for FMLA leave may constitute interference with the employee's FMLA rights as well as retaliation against the employee."). The Court concludes that because Plaintiff's interference claim arises from the same facts as his retaliation claim, it is "appropriate to treat Plaintiff's interference claim as identical to his retaliation claim and dismiss it as duplicative." Beese v. Meridian Health Sys. Inc., No. 11-7505 2014 WL 3519124, at *9 (D.N.J. July 16, 2014), aff'd, 629 F. App'x 218 (3d Cir. 2015); see also Lichtenstein, 691 F.3d at 312 n.25 (collecting cases).

Regardless, for the reasons expressed above, Plaintiff is unable to establish a causal connection between his protected leave and his transfer to billing. See Beese, 2014 WL 3519124, at *9 ("Plaintiff's FMLA interference claim must fail because, as with his FMLA retaliation claim, Plaintiff cannot demonstrate that the alleged interference . . . was caused by his taking FMLA leave."). Thus, to the extent Plaintiff asserts an FMLA interference claim, it may not proceed.

[20] Plaintiff's transfer to billing predates his complaints to HR and therefore cannot form the basis of his retaliation claim.

Defendants challenge the first and third element of Plaintiff's claims. As to the first element—the presence of a protected activity—Defendants concede that Plaintiff complained to HR about perceived discrimination but contend that he lacked an objective good faith basis to do so. The Court finds the record contains sufficient evidence to support an objective belief as to disability discrimination and FMLA retaliation, but not as to age discrimination.

"A plaintiff in a retaliation case 'need not prove the merits of the underlying discrimination complaint,' but "must have 'act[ed] under a good faith, reasonable belief that a violation existed.'" Daniels, 776 F.3d at 193 (quoting Moore v. City of Phila., 461 F.3d 331, 344 (3d Cir. 2006)). This requires an "'objectively reasonable belief' that the activity the plaintiff opposed constituted unlawful discrimination under the relevant statute." Id. (quoting Wilkerson v. New Media Tech. Charter Sch. Inc., 522 F.3d 315, 322 (3d Cir. 2008)).

While the record evidence shows that Defendants had decided to transfer Plaintiff prior to his medical leave, Plaintiff had no knowledge of any transfer discussions until he returned from leave on May 1, 2017. See PSAF ¶¶ 37-38. A reasonable jury viewing the evidence could conclude that from Plaintiff's perspective, Defendants suddenly transferred him into a position with a reduced workload and "less-complex, lower-level work," PSAF ¶ 39, shortly after he disclosed his need for surgery and medical leave to accommodate his disability.[21] This suffices to create a question of material fact as to the objective reasonableness of Plaintiff's beliefs.

However, no similar objective indicia exist as to Plaintiff's claim of age discrimination. In his written complaints to HR, Plaintiff explained that he believed the transfer was unlawful because (a) Plaintiff was over 60 years old at the time of the transfer, (b) he was terminated when his new job was no longer needed, (c) Defendants decided to transfer Plaintiff while Plaintiff was out on

---

[21] Defendants do not dispute that Plaintiff's heart condition is a "disability" under the ADA.

leave, and (d) Defendants did not inform Plaintiff prior to the transfer.[22] See Pl. Exs. D-E. None of these facts support a reasonable belief of age discrimination, and the record is devoid of other evidence to support such a belief.[23]

Defendants next argue that Plaintiff cannot establish a causal nexus between his complaints and his termination. The Court disagrees. Plaintiff forwarded his final complaint to HR on July 31, 2017. PSAF ¶ 77; Pl. Ex. D. Two days later—and in direct response to an email from Lee forwarding Plaintiff's complaint—Feeley requested a meeting to "map out the path forward to termination." PSAF ¶ 84; Pl. Ex D. Feeley's email, along with Plaintiff's termination one week later on August 10, 2017, creates an "unduly suggestive" temporal proximity sufficient to establish Plaintiff's prima facie case. See Lichtenstein, 691 F.3d at 307.

Lastly, Defendants argue that no evidence suggests that Defendants' proffered reason for termination—the phase out of Vertex—was false or that Defendants' real motivation was retaliatory animus. Again, the Court disagrees. In addition to the previously discussed evidence concerning the timing of Plaintiff's termination relative to the shutdown of Vertex, Feeley testified that (a) his reaction to Plaintiff's July 31st complaint was that he "needed to talk to HR about his termination," Feeley Dep. Tr. 75:2-76:5; (b) Plaintiff's email triggered a "frustration that [Plaintiff] was still with the organization," id. at 81:3-5; and (c) he was responsible for the final decision to terminate Plaintiff in August 2017, id. at 172:15-173:6. At minimum, Feeley's testimony creates a reasonable inference that Plaintiff's complaint resulted in his termination at an earlier date than BRLI had previously anticipated.

---

[22] Similarly, Plaintiff testified that he believed his transfer was an act of discrimination simply because (a) "it happened," (b) Plaintiff "wasn't told about it in advance;" and (c) "billing essentially had nothing for [Plaintiff] to do." Pl. Dep. Tr. 99:24-102:11. Plaintiff further testified that no one at BRLI made disparaging remarks about his age. Id. at 84:25-85:5.

[23] For the same reasons discussed in Section III.A.1., supra, the remaining circumstantial evidence proffered by Plaintiff likewise fails to raise a reasonable inference of age discrimination.

16

Plaintiff has therefore demonstrated a question of material fact as to whether Defendants retaliated against him for his complaints of disability and FMLA discrimination. Summary judgment is warranted on Plaintiff's ADEA retaliation claim.

**B.    Failure to Hire**

Defendants last argue that summary judgment is warranted on Plaintiff's failure to hire claims. The Court agrees.

To establish a prima facie failure to hire claim, a plaintiff must show that (1) he "belongs to a protected category;" (2) he "applied for and was qualified for a job for which the employer was seeking applicants;" (3) he was rejected; and (4) after his rejection, either (a) "the position remained open and the employer continued to seek applicants," or (b) "the position was filled with a person not belonging to the protected category." Golembeski v. Moorestown Twp. Pub. Sch., No. 11-2784, 2013 WL 1007672, at *5 (D.N.J. Mar. 13, 2013) (citations omitted). Plaintiff alleges that Defendants rejected his applications for four open positions: "HL 7 Integration Developer," "Business Analyst," "QA Analyst," and "Data Analyst." Compl. ¶ 58. The Court assumes, arguendo, that Plaintiff has adequately shown his qualification for each position for purposes of the prima facie case.[24]

Plaintiff cannot establish a prima facie case based on the HL7 Integration Developer position because Defendants never filled that position. See Calton Decl. ¶ 10. Plaintiff has not cited, and the Court is unable to locate, any evidence in the record indicating when Defendants ceased their efforts to fill the position. Plaintiff therefore has not established that Defendants "continued to seek applicants" after his rejection.

---

[24] Defendants dispute this element, at least as to certain positions.

Plaintiff has arguably established a prima facie case as to the Business Analyst and QA Analyst positions, at least on his claims of age discrimination.[25] Plaintiff, however, has failed to rebut Defendants' proffered business reason for failing to hire Plaintiff: that they selected more qualified candidates. Plaintiff argues that "he was more qualified than both of the successful candidates identified by Defendant[s]" and invites the Court to compare Plaintiff's resume to those of Defendants' preferred candidates. Pl. Opp. at 25. But "it is not this court's role to second-guess an employer's business judgment as to who is more qualified for the job." Dungee v. Ne. Foods, Inc., 940 F. Supp. 682, 689 (D.N.J. 1996). Rather, to show pretext Plaintiff must present evidence that Defendants believed Plaintiff was the more qualified candidate. Id.; see also Gardner-Lozada v. SEPTA, 643 F. App'x 196, 200 (3d Cir. 2016) (explaining that the Court should defer to an employer's determination as to qualification absent evidence that "the standard . . . the employer relied on was obviously weak or implausible") (citation and quotation marks omitted).

The record is largely devoid of evidence concerning Defendant's decision-making process for the Business Analyst and QA Analyst positions. The record shows only that (a) hiring decisions were made by Defendants' TA department, with input from the hiring manager who posted the listing, see Calton Decl. ¶¶ 3-4; Washburn Dep. Tr. 165:4-168:8, and (b) the decisionmakers involved in Plaintiff's transfer and termination were not the relevant hiring managers and did not otherwise participate in these hiring decisions, see Calton Decl. ¶¶ 7-8.[26] Plaintiff has consequently failed to provide evidence that Defendants subjectively believed Plaintiff was more qualified, that the relevant decisionmakers were motivated by discriminatory

---

[25] Plaintiff's evidence suggests that Defendants ultimately hired significantly younger employees for the Business Analyst and QA Analyst positions. PSAF ¶ 69.

[26] Lee, Mooney, and Feeley each disclaimed any knowledge of or participation in Defendants' review of Plaintiff's applications for these positions. See PSAF ¶ 65; Mooney Dep. Tr. 203:21-204:13; Feeley Dep. Tr. 133:9-134:2. Washburn testified only that he participated in the hiring process for the Data Analyst position, which the Court addresses below.

or retaliatory animus, or that Plaintiff's exercise of FMLA right was a "negative factor" in the no-hire decisions.

Finally, while Plaintiff has likely demonstrated a prima facie case as to the Data Analyst position,[27] he has likewise failed to present evidence of pretext. Washburn testified that he served as hiring manager for this position, that Defendants "didn't find a qualified candidate for the role," and that after a year of searching, Defendants removed the position. See Washburn Dep. Tr. 169:23-170:16, 183:24-185:4. In total, Defendants rejected 618 candidates before cancelling the position. Calton Decl. ¶ 9. Though the age, qualifications, and disability status of the other candidates are unknown, Defendants' cancellation of the position despite such a large body of applicants weakens the inference that they failed to hire Plaintiff (or any particular candidate) for unlawful reasons. More critically, Plaintiff has again pointed to no evidence suggesting that Defendants believed Plaintiff was a qualified candidate or that any decisionmaker negatively considered Plaintiff's age, disability, exercise of FMLA rights, or complaints of discrimination. The Court further concludes that the mere fact that Washburn had some involvement with the hiring process is insufficient to show pretext or discriminatory animus.[28] Summary judgment is thus proper on each of Plaintiff's failure to hire claims.

## V. CONCLUSION

For the reasons stated above, Defendants' Motion for Summary Judgment, ECF No. 38, is **GRANTED IN PART** and **DENIED IN PART**. Plaintiff has demonstrated a dispute of material fact as to whether Defendants terminated Plaintiff in retaliation for (1) his invocation of protected

---

[27] In contrast to the lack of evidence concerning the HL7 Integration Developer position, Washburn testified the Data Analyst position remained "open for over a year" while Defendants continued to search for suitable candidates. Washburn Dep. Tr. 169:23-171:10.

[28] Washburn's precise role is unclear, and Plaintiff has not demonstrated that Washburn was ultimately responsible for rejecting his application. Washburn testified that he did not recall reviewing Plaintiff's resume and did not know if Plaintiff was qualified for the position. Washburn Dep. Tr. 172:10-14, 173:3-8.

medical leave, in violation of the FMLA; or (2) his good faith complaints to management concerning disability discrimination and FMLA violations, in violation of the ADA, FMLA, and NJLAD.  Summary judgment in favor of Defendants is granted on Plaintiff's remaining claims.  An appropriate order follows.


Date: May 26, 2021                                                         /s/ *Madeline Cox Arleo*
                                                                       **Hon. Madeline Cox Arleo**
                                                                       **UNITED STATES DISTRICT JUDGE**